**LIKINS–FOSTER MONTEREY CORPO-
RATION, a Delaware Corporation, and
Likins-Foster Ord Corporation, a Dela-
ware Corporation, Appellants,**

v.

**UNITED STATES of America,**
Appellee.

Nos. 17218, 17956.

United States Court of Appeals
Ninth Circuit.

Oct. 1, 1962.

Lytle, Johnston & Soule, and Roy C. Lytle, Oklahoma City, Okl., Joseph M. Williamson, Urbana, Ill., Danzansky & Dickey, and Raymond R. Dickey, Washington, D. C., Lillick, Geary, Wheat, Adams & Charles, and Edwin L. Gerhardt, San Francisco, Cal., for appellants.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis and S. Billingsley Hill, Attys., Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., Charles R. Renda, and J. Harold Weise, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before BARNES, HAMLEY and HAMLIN, Circuit Judges.

HAMLEY, Circuit Judge.

In this suit by the United States to condemn two Wherry housing projects at Fort Ord, California, the testimony as to value ranged from $650,000 to $3,880,-000. The jury returned a verdict of $1,-106,000 and judgment in that sum was entered. The two condemnees, jointly referred to herein as Likins-Foster, appealed.[1]

---

[1] The opinion of the district court denying defendants' motion for a new trial is reported sub nom. United States v. Certain Interests in Property in Monterey County, etc., 186 F.Supp. 167.

This court thereafter remanded the cause to the district court for the purpose of permitting it to consider a motion, made by Likins-Foster, to vacate the judgment and grant a new trial. The district court denied the motion and Likins-Foster filed a second appeal. The two appeals have been consolidated for argument and disposition in this court.

Appellant corporations were formed for the purpose of constructing and operating two housing projects at Fort Ord pursuant to the provisions of the Wherry Act of August 8, 1949, 63 Stat. 570, 12 U.S.C.A. § 1748. The projects, considered together, consist of six hundred and fifteen residential buildings comprising one thousand dwelling units, with necessary streets, walks, carports, service buildings and sewage systems. The buildings are one-story structures of pumice concrete construction with concrete walls and roofs. The first project was completed in July, 1952, and the second in June, 1953.

These facilities were constructed on 219.5 acres of government land under two long-term leases calling for a total rental of two hundred dollars annually. One lease was executed on November 16, 1950, and the other on June 27, 1952. Both leases were for seventy-five years, but one was cancellable at the end of fifty years.

In arranging the financing for these projects, the Federal Housing Administration (FHA) estimated that the original cost, payable by the sponsors, would be $9,737,257.[2] Under the authority of the Wherry Act, FHA authorized, and Likins-Foster placed, federally insured mortgages totaling $8,742,400, representing approximately ninety per cent of the estimated cost. Each mortgage was to mature thirty-two years and seven months from the date of its issuance.

Under the Capehart Act, enacted on August 11, 1955, 69 Stat. 646, as amended, 12 U.S.C.A. § 1748, 42 U.S.C.A. § 1594a, government acquisition of all Wherry housing projects located at or near military bases where construction of Capehart housing had been approved was made mandatory. Pursuant to this requirement this condemnation action was commenced on November 1, 1957. The government deposited $782,053 estimated compensation with its declaration of taking filed on that date.

On the main appeal Likins-Foster advances three general grounds for reversal. One of these is that the government's appraisal witnesses, Robert C. Hastings and William W. Mollan, based their estimates of value on a number of false assumptions of fact and law. It is argued from this that their testimony was incompetent and objections thereto should have been sustained, failing which the jury verdict was deprived of a substantial basis in the record.

■ The rule which appellants ask us to invoke is that where unwarranted theories of law or assumptions of fact guide the expert and are used as a basis for value, the evaluation will be set aside. See United States v. Honolulu Plantation Co., 9 Cir., 182 F.2d 172, 178.

One of the false assumptions which the government witnesses made, appellants assert, had to do with net income and rate of return. With regard to these factors, it is argued, these witnesses made the false assumption that the FHA Commissioner: (a) possessed the power to establish a rigid net dollar income or rate of return for the entire life of the insured mortgage, permitting it to vary only to reflect changes in operating expenses; (b) possessed the power to enter into, and had entered into, a contract establishing a rigid net dollar income; and (c) properly adopted regulations and policies which operated rigidly to peg net income.

In order to determine exactly what assumption the government witnesses made in this regard and whether such assump-

2. While the actual cost of contruction was later certified to FHA by the sponsors as being $8,507,655, FHA used the $9,737,257 estimate in computing the allowable return. It did not include $210,872 for on-site improvements or $47,198 for off-site improvements paid by the military.

tion was false in any sense that would render their testimony incompetent, the legislative policy behind the Wherry Act, and pertinent provisions of the Act calculated to achieve that policy, must be considered.

■ The over-all design of the Act was to bring about, through the cooperative effort of the government and private business, needed low-cost housing on or adjacent to military installations. United States v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, 252.

In order to interest private business in such projects, special inducements were provided in the Act. FHA mortgage insurance was made available through a new certificate procedure. The cost of land acquisition was eliminated by the leasing of federal land for long terms at nominal rentals. Provision was made for utility service by the military on a long-term basis.

In practice there were other inducements. Sponsors were excused for a long initial period from amortization payments. Where sponsors were building contractors they received or were credited with builder's fees. There was the possibility, which became a reality in this case, that the project could be constructed at a cost less than the FHA estimate, so that the sponsor would have the use of mortgage proceeds in excess of the intended limit of ninety per cent of the cost of the project.

Some of these inducements also had the effect of minimizing the cost of the project, thereby setting the stage for low rents. But to further assure low cost housing the Wherry Act empowered FHA to impose controls on such matters as rents or sales, charges, capital structure, rate of return, and methods of operation. Wherry Act of August 8, 1949, 63 Stat. 570, 572 § 803(b) (1).

In the exercise of these controls FHA has set a policy in Wherry projects whereby the return allowed from rentals on the project is not to exceed 6.5 per cent of FHA's estimate of original cost. FHA has rigidly adhered to the policy of maintaining this fixed return through all business cycles since the 1940's and during the administration of seven Commissioners.

The rentals which may be charged the military personnel have been fixed on that basis. Increases have been allowed in the rent schedules to meet increased operating costs, taxes and the like, but the return allowed to the project has not been permitted to exceed 6.5 per cent. Nor has it been changed from that fixed at the time of original processing, except to correct errors and oversights.

On the project involved in the case before us, the return allowed was fixed at the time of processing at 6.1 per cent of the estimated original cost. This is 6.99 per cent of certified actual cost. That return is for the entire leasehold interest before deduction of debt service.

In arriving at their opinions as to value the government witnesses assumed that this net return to the sponsors, fixed at the commencement of the projects, would continue to be controlled in the future at the same rate.

This assumption was not predicated on the view that FHA was without statutory power to change its past policy as to these matters, or that the agency had deprived itself by contract or regulations of the power to make such a change. These witnesses agreed that FHA had authority to change its policy and the jury was similarly instructed.

Nor did the government witnesses assume that, in setting controls governing net income and rate of return, FHA was not required, under the Fifth Amendment to be reasonable in establishing rents, charges and methods of operation. Again, the jury was specifically instructed that FHA had a constitutional duty to permit a fair dollar return on the value of the assets after taking into consideration all the relevant facts and circumstances, including the entire history of the project.

■■ What the government witnesses did assume was that, considering consistent past FHA practice, through the

ups and downs of the business cycles, the controls which had resulted in stabilized rents in the past properly could and probably would be maintained in the future. This was an exercise of judgment just as was the assumption of John L. Vaughan, Jr., the valuation witness for Likins-Foster, that in the future FHA controls would be relaxed to the point of permitting a ten per cent increase in rents. The evaluation of these varying appraisal judgments was for the jury. This court is in no position to say that one of these assumptions was true and the other was false, rendering the latter testimony incompetent.

Another false assumption of the government witnesses, it is urged, was in considering it appropriate to rely upon sales of similarly regulated and restricted housing projects to determine a multiplier or rate of return (capitalization rate), although it was stipulated that such sales were not comparable.

During the pretrial conference a stipulation was agreed upon that:

"* * * there are no comparable sales that should be considered by the jury in this case, and there will be no proffer of any comparable sales in the trial of this cause * * *."

For the purpose of establishing value, all witnesses relied principally on processes of capitalizing income. In such processes, an important element is the capitalization rate or multiplier. The government's witnesses Mollan and Hastings applied a 7.13 per cent and a 7.25 per cent capitalization rate, respectively, in arriving at an opinion as to value.

Mollan testified that he arrived at his 7.13 per cent capitalization rate by studying the market on the basis of the practice of buyers. He consulted research articles, studied publicity put out by buyers and financial experts, and looked to the rate of return in the market on FHA housing projects. Hastings based his 7.25 per cent capitalization rate on an over-all analysis of investments, ranging from low to high risk types of security, including the average ratio of price to net income resulting from the sale of fourteen FHA-financed projects.[3]

Appellants argue that such use of FHA investment experience was improper because it constituted a violation of the stipulation quoted above.

In rejecting this contention when reviewed on the first motion for a new trial, the district court drew a distinction between the use of comparable sales as direct proof of the value of the condemned leasehold, and its use as an aid —along with other data—in setting a capitalization rate for the property condemned. The court concluded that the stipulation was intended to preclude evidence concerning the sale of other Wherry projects in direct proof of value, but not to prevent reference to such sales in arriving at a just capitalization rate.[4]

■■ Even in the absence of specific record support we would be inclined to rely upon a district court's interpretation of a stipulation arrived at during pretrial proceedings and approved by the court. But here the record provides substantial support for the construction which the district court placed upon the particular stipulation here in question. It reveals that government counsel clearly stated during the discussion leading to entry of this stipulation that they understood the stipulation, and expected to apply it, exactly as they did apply it

---

3. Concerning these FHA projects, Hastings testified that the average net income divided by the equity price involved in the sale of the project equalled 18.8 per cent. With regard to the 7.25 per cent capitalization rate which this witness utilized, he stated that he "found transactions in which buyers and sellers agreed at approximately the same ratio that I have used as a capitalization rate." The trial court inquired whether, when

the witness took into consideration these other FHA transactions, he took into consideration what the purchasers paid for the projects. Hastings replied: "The price paid for the project in relation to the amount of net operating income."

4. United States v. Certain Interests In Property In Monterey County, etc., D.C., 186 F.Supp. 167, 169–170.

during the trial.[5] We conclude that the assumption of the government witnesses that it was proper to refer to such data for the limited purpose indicated was entirely warranted.

Appellants argue that the government witnesses made the false assumption that a vacancy rate of three per cent could be used in diminution of income, resulting in a substantial lowering of value. This assumption was false, it is contended, because there existed no factual evidence to support such a conclusion and there was a stipulation that there was a continuing need for these and additional military housing units at Fort Ord.[6]

In calculating future income over a period of many years the government witnesses expressed the view that ninety-seven per cent occupancy represented a reasonable norm. Indicating his reason for believing that the almost one hundred per cent occupancy at the time of the taking would not continue indefinitely, Hastings testified:

"* * * In later years it must be considered that as the property becomes competitive or as new property becomes competitive, that the same ratio of occupancy cannot continue to exist." [7]

■ The jury was thus made aware of the basis for the three per cent vacancy assumption—that it rested on judgment and experience rather than observation or other tangible evidence. The assumption was not contrary to the stipulation since the latter was limited to housing needs "as of November 1, 1957."

The use of this assumption did not render the testimony of the government witnesses inadmissible.

■ Appellants contend that the government witnesses based their opinions as to value on the false assumption that there was no special value in the lease attributable to the owning corporation which would affect just compensation. The falsity of this assumption, it is urged, lies in the fact that the corporation had 215 acres of strategically located land under lease for a nominal contract rental of $200 a year. These circumstances, appellants contend, entitled them to the allowance of a bonus value in the lease which was denied them under the assumption made by the government witnesses.

The low rentals charged Likins-Foster for the land were a contribution to the project made by the government as one means of minimizing operating costs and thereby holding down housing unit rentals. The sponsor was required to pass on to the tenants, in the form of lower rents, the cost saving resulting from the low leasing rate it paid. Any person succeeding to the sponsor's rights under the lease would have been subject to the same control. Therefore no transferable value attached to the low land rental.

■ Only transferable values are compensable in eminent domain proceedings. Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765. It follows that Likins-Foster was not entitled to a bonus value based on this circumstance and the government witnesses were correct in making this assumption.[8]

---

5. Appellants' witness Vaughan placed primary reliance on the fact that the original investors were attracted to Wherry investments by the 6.5 per cent return which FHA allowed on them.

6. The stipulation was as follows:
   "* * * there existed a continuing need for this and additional military housing at Ford Ord at the time the subject housing was taken by the Government; that is, as of November 1, 1957, there existed a continuing need for this additional military housing at Ford Ord."

7. Amplifying this view on cross-examination Hastings testified:
   "* * * I took into consideration the hazards of military occupancy, the changing strength based upon military movements, the needs for personnel, and budgets considerations. That was taken into consideration, although it isn't a thing that can be observed."

8. Appellants' valuation witness allowed no additional value for land.

Appellants argue that the government witnesses made the assumption, assertedly false, that no value was attributable to ownership by virtue of the four per cent financing on the FHA mortgage, notwithstanding the fact that as of the date of taking no financing was available at a rate less than five per cent. It is argued that appellants were entitled to have this favorable financing awarded a bonus value.

The general benefit to the sponsor of a four per cent mortgage rate was compensated for in the capitalization of income process employed by the government's witnesses. Both Mollan and Hastings so testified.[9] If the sponsors had a five per cent mortgage, the capitalization rate would have to be raised (and valuation lowered) to assure the acquiring owner the same yield on his equity capital. We hold that this assumption made by the government witnesses did not render their testimony incompetent.[10]

Appellants base a group of arguments on the process of valuation employed by the government witnesses. It is argued that the process they employed is not capitalization of income as courts have recognized it and permitted it to be utilized as a measure of just compensation. Instead, appellants assert, it is a method based on illogical testimony, contrary to all principles of valuation, and unsound as a matter of law.

The government's witness Mollan capitalized a stabilized annual income of $627,700 at 7.1307 per cent on a straight-line basis and deducted debt. In addition he capitalized an income of $136,661 (which was annual income less annual debt charges, i. e., the income of the equity only) at twenty per cent on a level basis for a value of equity only. The two figures came out virtually the same. From the smaller figure of $8,802,700, he deducted the outstanding mortgage balance of $8,119,395, to arrive at $683,000 as the value of appellants' equity interest.

The other government witness, Hastings, capitalized a stabilized annual income of $633,227 at 7.25 per cent on a straight-line basis, and produced a figure of $8,734,165. Adding $34,325 to adjust for short-term excess income, Hastings arrived at a figure of $8,768,490, which he rounded out to $8,770,000. Deducting a mortgage balance of $8,119,396, he reached a valuation figure of $650,604.

Appellants argue that the impropriety of this method of determining value is revealed when the same methods are applied under stated hypothetical situations. One such assumed situation would be where the net cash to the equity is $50,000 less than the Hastings' estimate.[11] Another would be where a less seasoned investment than this one was in November, 1957, is involved. In pur-

9. Mollan testified:
   "Q. What benefit does the seller get from the low interest rate after he sells it?
   "A. By capitalizing at the low interest rate that is required for the debt service he receives a benefit of the low —of the favorable financing, and if we give them another $700,000 on top of that, we are giving it to them twice * * *."
   Hastings testified:
   "Q. Now, in giving consideration to this project, Mr. Hastings, did you give any value to the 4 per cent mortgage involved here?
   "A. I assigned no specific value. The rate at which I capitalized the income is that rate which would apply only if there were a 4 per cent mortgage. If there were no mortgage, the cash investor would necessarily apply a higher capitalization rate, because he would be entitled, by reason of investing more money, to a higher rate of return."

10. In United States v. 190.71 Acres of Land in Lake County, Ill., 7 Cir., 300 F. 2d 52, 66, this reason for upholding the assumption that no bonus value was attributable to the favorable financing was rejected, but only for the reason that no such suggestion was made in the trial court, having been advanced for the first time in the government's reply brief on appeal.

11. The net cash to equity, according to Hastings, would be approximately $122,027, arrived at by deducting annual amortization and interest ($520,254),

suing this line of argument, and in the government's response thereto, accounting principles and practices are discussed in great detail.

It would serve no useful purpose to set out in this opinion a step-by-step analysis of these conflicting concepts of proper valuation techniques. Some of the differences of opinion represent nothing more than the normal range of views among appraisal experts concerning the judgment factors which are always present in such an undertaking. The government's witnesses came up with one set of answers and appellants' witnesses came up with another.[12] Neither set of answers was wholly accepted by the jury, as its verdict indicates.

The remaining differences of opinion stem from the fact that appellants want to have their interest in the project valued free from the restrictive elements in Wherry housing, while the government is not willing to have that done.

In essence the appellants' position in this regard has already been rejected in connection with our discussion of the so-called false assumptions. In substance the same contention was advanced and rejected by this court in Fairfield Gardens, Inc. v. United States, 9 Cir., 306 F.2d 167. Likewise, the view that

for purposes of just compensation, complete flexibility of rents in a Wherry housing project should be assumed, was rejected in Beuna Vista Homes, Inc. v. United States, 10 Cir., 281 F.2d 476, 478; and United States v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, 253.

We are satisfied that the government testimony was not impermissible or weightless in contemplation of law. While this testimony still had to be measured for probative value, the fact-finding function is entrusted to the jury, and not this court.

In the statement just made we have assumed that the jury was properly instructed. If not, the verdict might not represent a fair award however appropriate and substantial the government evidence may have been.

Appellants contend that they withdrew a requested instruction as to the importance of examining the property, in determining the amount of depreciation, on the understanding that certain stipulations would be read to the jury *in toto*. But the stipulations were not read *in toto* at any point to the jury, appellants assert, and among these was one which would have told the jury that the physical condition of the property was excellent.

---

from estimated annual net income of $633,227 and adding short-term excess income of $9,054.

12. Vaughan, testifying for appellants, utilized both a reproduction cost less depreciation and a capitalization of income method. On the basis of a detailed field investigation Vaughan estimated reproduction cost on November 1, 1957, at $12,356,997. Deducting $821,391 for physical depreciation (no deduction was made for functional or economic obsolescence), a figure of $11,535,606 was achieved, representing the cost of replacing the physical assets as they existed on the indicated date.

With regard to capitalization of income, Vaughan first made a computation on the basis of the FHA controls that were in effect on the day of the taking. On this assumption he estimated net operating income at $669,240, which he capitalized at six per cent for a forty-year period to reach a capital value of $10,069,586. Rounding this out to $10,070,000, Vaughan added $296,000 for the value of the equipment and $752,000 bonus value for the favorable financing, and a figure of $11,118,000 was produced.

Vaughan then went through the same capitalization of income process, but on the assumption that there would be a ten per cent across-the-board increase in rental income. He also assumed a concurrent increase in the vacancy factor of from one-half of one per cent to two per cent. The figure resulting from this computation was $12,381,000. Giving consideration to his reproduction cost less depreciation figure, and his two capitalization of income figures, Vaughan gave a value range of from $11,800,000 to $12,000,000. Deducting the outstanding mortgage balance, Vaughan expressed the opinion that the value of the equity interest of appellants on November 1, 1957, was from $3,680,000 to $3,880,000.

All the stipulations were either read verbatim or were closely paraphrased in instructions which the court gave during the course of the trial. The particular instruction on depreciation to which appellants made reference was read verbatim. There was no error with respect to this matter.

■ Appellants argue that the cumulative effect of the government's requested instructions 6, 11, 12, 18 and 19, which were given by the court, was to confuse and mislead the jury and to encourage them to take into consideration factors not supported by the evidence. This prejudicial result, it is asserted, was due to the fact that these instructions stress the existence of regulations and restrictions tending to indicate a power possessed by the Commissioner to limit income without reference to the mandate of reasonableness spelled out by the court earlier in its charge.

The court instructed the jury that such controls existed but also instructed that government officials were "compelled to be reasonable in establishing the rents, charges and methods of operation to permit a fair dollar return." The court did not err in giving these instructions.[13]

■ Appellants complain of the failure of the trial court to instruct the jury as to the application of the so-called "Wunderlich Statute," 41 U.S.C.A. § 321, pertaining to arbitrary, capricious or fraudulent decisions by government officials. Appellants do not assert in their brief that they made timely request for such an instruction. See Rule 51, Federal Rules of Civil Procedure, 28 U.S. C.A. Nor is such a requested instruc-

tion set out in appellants' brief, as required by Rule 18(d) of the Rules of this court, 28 U.S.C.A.

The matter of giving such an instruction was discussed after all instructions were given. The trial court declined to recall the jury and give such an instruction holding that the jury had been adequately advised that the conduct of any governmental official could not be arbitrary or capricious. We agree.

In the remanded proceedings, appellants, pursuant to Rule 60(b) (3), moved to vacate the judgment rendered on the verdict and grant a new trial because of alleged fraud practiced on the trial court.[14]

This fraud, it is asserted, was disclosed when Hastings testified at the 1962 trial in the Fort Benning, Georgia, Wherry housing project condemnation. He there stated that he thought he had known from the beginning (1957), "  *  *  * that buyers and sellers just do not capitalize net income before debt service in an FHA-insured project *  *  *." This testimony, it is claimed, proves that the witness was deceiving the court during the 1960 trial of the Fort Ord case when he testified that he had found sales of FHA-financed projects in which buyers and sellers agreed at approximately the same ratio as he had used as a capitalization rate. The ratio referred to was one obtained by dividing average net income by the equity price.

The trial court denied the motion, holding that, comparing Hastings' testimony in the two trials, there were no inconsistencies therein that can be characterized as either fraudulent or perjured.

13. See Fairfield Gardens, Inc. v. United States, 9 Cir., 306 F.2d 167; Buena Vista Homes, Inc. v. United States, 10 Cir., 281 F.2d 476, 478; United States v. Benning Housing Corporation, 5 Cir., 276 F.2d 248, 253.

14. In the alternative, appellants moved that the motion be regarded as initiating an independent action to vacate the judg-

ment. The trial court held that relief could not be granted under Rule 60(b), because the one year limitation period applicable to motions under that rule had run. The court held, however, that the motion could be entertained as a pleading initiating an independent action to set aside a judgment because of fraud perpetrated on the court.

Appellants contend that the trial court erred in so ruling, and in denying its motion to vacate the judgment.

Hastings' testimony in the Fort Benning case was as follows:

"But there is so much in fact of debt affecting the application of Wherry projects, that I found that buyers and sellers do not capitalize net income before debt service in an FHA-insured project. * * * I think I've known it from the very beginning. I think in 1957 I said it and I may have taken a period where I thought it was perhaps more proper to capitalize net income before debt. But in analyzing sales and talking with buyers and sellers very extensively during the last two months, I haven't found any of them that used anything but the multiplier of the cash flow."

We agree with the trial court that Hastings' testimony in the Fort Benning case has no tendency to show fraud with respect to his testimony in the Fort Ord case. It shows only that the views of the witness concerning this problem had wavered and were, in 1957 and 1962, contrary to those he expressed at our trial in 1960. The quoted testimony makes it clear that his 1960 views were sincerely held, and that his 1962 return to his original position of 1957 was the result of intensive investigations in the winter of 1961–1962.

We are in complete accord with the following views expressed by the trial court in rejecting, as specious, appellants' charges of fraud:

"There are no inconsistencies in Hastings' testimony that can be characterized as either fraudulent or perjured. It is commonly agreed that the field of real estate appraisal is not an unyielding one; that the methods an appraiser uses may vary with what he finds in the market place. The statements that defendants rely on as indicating fraudulent testimony by Hastings merely show that the witness has indulged in a continual process of refining and testing his appraisal techniques. There is no legal principle that denies to an expert witness the right to refine his methods. Nor is there any evidence that at the time Hastings testified in the Fort Ord case he did not do so with complete candor."

The judgment in No. 17218 and the order in No. 17956 are affirmed.