**Norman K. WINSTON, David Muss, Joshua A. Muss, Helene Muss Harpman, et al., Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 19106.**

United States Court of Appeals Ninth Circuit.

March 2, 1965.

Rehearing Denied May 4, 1965.

Barry Brannen, Beverly Hills, Cal., for appellants.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Robert M. McKee, Edmund B. Clark, Attys., Dept. of Justice, Washington, D. C., Francis C. Whelan, U. S. Atty., Los Angeles, Cal., for appellee.

Before POPE and BARNES, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge:

This is a Wherry Act condemnation case. The housing project in question, known as the Bayview Project, situated near the San Diego Naval Base, was completed in December, 1954. The federal legislation under which the project was constructed and the legal relationships created for the purpose of the construction and subsequent leasing, control, operation and maintenance of the housing project are identical with those which have been fully discussed, described and analyzed in other Wherry Act condemnation cases. See, for example, Fairfield Gardens, Inc. v. United States (9 CCA 1962), 306 F.2d 167; Likens-Foster Monterey Corporation v. United States (9 CCA 1962), 308 F.2d 595; United States v. Certain Interests in Property (2 CCA 1964), 326 F.2d 109. Here, again, the leasehold interests of Appellants, subject to the existing FHA insured mortgages, have been condemned pursuant to the mandatory provisions of the Capehart Act (42 U.S.C. § 1594). The date of taking was June 1, 1959, and the issue, tried before a jury, was just compensation for the interests taken.

The ground rules for the jury trial were laid by a pre-trial order entered after comprehensive pre-trial proceedings. Pertinent portions of this order are quoted in the margin.[1] After entry of the

1. IT IS FURTHER ORDERED that the following rulings have been made and will be made at the trial to the admission of evidence:

1. The date of valuation will be as of 12:01 A.M. June 1, 1959.

2. No evidence as to the reproduction or replacement cost of the improvements located on the land shall be admitted.

3. Evidence of the actual cost of construction shall be admitted, not as a measure of value, nor as evidence of what it would cost to replace these improvements at the present time, but solely as evidence as to what a willing, prudent buyer and seller could contemplate or expect in the way of income and rental ceilings in the future under the authority of the Commissioner to regulate and restrict the rentals.

4. The following method shall be considered as proper approaches to the determination of the value of the estate being condemned, and evidence which is competent in other respects as necessary in applying these methods shall be received:

CAPITALIZATION OF NET INCOME
BEFORE DEBT SERVICE

The projected net income, after payment of fixed charges, all expenses, and the annual amount required by the commitment for insurance for the reserve for replacements, but before allowance for depreciation and debt service, which includes principal and interest payments and the mortgage insurance premium, is capitalized, producing the capitalized value of the net income, and thus the indicated value of the conditional ownership in the leasehold. The indicated value of the equity, that is, the interest of the sponsors as encumbered by the mortgages, is then determined by deducting, from the capitalized value of the net income, the unpaid balance of the mortgages.

CAPITALIZATION OF NET INCOME
AFTER DEBT SERVICE

The projected net income, after payment of fixed charges, all expenses, the required payment to the reserve for replacement, the debt service, which includes principal, interest and mortgage insurance premiums, but before any allowance for depreciation, is capitalized producing the capitalized value of the net cash flow and therefore the indicated capitalized value of the ownership interest which earns such net cash flow.

The Court, by the above definition does not hold that the indicated value of the equity interest or the indicated value of the combined equity and mortgages interests precisely measures fair market value of such interest, but witnesses may make such adjustments or allowances necessary or proper to reach an opinion of fair market value. Competent evidence in support of such adjustments and allowance may be received.

5. The defendant was required to establish and maintain with the Republic National Bank of Dallas a reserve fund for replacement by depositing annually (in monthly installments) the amount of $33,679.00 and at the date of taking the balance in the funds was $122,488.99. The unpaid balance was paid over to the company at or about the time this proceeding was instituted.

The parties may introduce testimony concerning the purpose for which the fund was established, the restrictions placed on its use, and the dispositions

pre-trial order, a separate court trial of the "windfall" issue was held pursuant to stipulation.[2] The Court entered findings of fact and found that there was a windfall. The findings are quoted in the margin.[3] Finally, a Supplemental Pre-Trial Order was entered [4] and the stake was set for the jury trial.

to be made of the unpaid balance on the termination of the lease. The witnesses may consider in reaching an opinion of fair market value that the balance of the accumulated reserve funds has been drawn down by the defendants and would no longer be available for the purpose for which it was established; and are entitled to consider what, if any, depreciation has occurred which has not yet been paid for out of the fund; and by reason thereof may make any adjustments or allowances in the projected income or the capitalization rate applied in reaching an indicated value, or may make adjustments to the indicated value in reaching an opinion of fair market value.

6. Evidence relating to the sale of other property or investments comparable to the instant project may be considered and testified to by the witnesses for the purpose of showing the relative risk, the ratio of overall prices to net income before debt service, and the ratio of equity price to net income after debt service.

7. The burden of proof upon the issue of just compensation is with the defendant who shall have the right to open and close in the presentation of evidence and argument to the jury.

2. IT IS HEREBY STIPULATED by and between the parties hereto, through their respective attorneys, that at the Pretrial now set for October 2, 1962, in the United States Customs and Court House, San Diego 1, California, at the hour of 10:00 o'clock A.M. on said day, the Honorable James M. Carter, sitting without a jury, may consider and rule on the following questions set forth and reserved for determination in the Memorandum of said United States District Judge to Counsel dated June 30, 1961, viz:

(1) What items can properly be considered in making up the actual cost of construction?

(2) What was the actual cost of construction?

(3) Did there exist a windfall?

it being understood that with respect to such issues, only, a jury trial is waived by all of the parties hereto.

3. 1. The actual out-of-pocket cost incurred by the parties having any identity of interest with the leases of the land on which the project was constructed, would be considered by Federal Housing Administration as proper items in computing the actual cost of construction, for the purpose of processing any application of the builder or any subsequent purchaser for a rental increase or otherwise carrying out Federal Housing Administration's responsibilities and powers in supervising the project.

2. The builder's fee allowed by the Federal Housing Administration in estimating the replacement cost of the project, and home office general overhead not directly spent and charged to the project would not be considerd out-of-pocket cost for the purpose of processing any such application.

3. Prepaid premiums of insurance of mortgage indebtedness created on, and continuing after, the date of completion and deposits escrowed to pay taxes and general insurance to be incurred in the operation of the project subsequent to the date of completion would not be considered by the Federal Housing Administration as out-of-pocket cost.

4. The total of all items which Federal Housing Administration would consider as out-of-pocket cost of the construction was $6,629,398.44.

5. It has been stipulated that the total "mortgage proceeds" amount to $6,984,-686.00. Accordingly, the excess mortgage proceeds over and above the out-of-pocket cost, as the same would be detertermined by the Federal Housing Administration, is the sum of $355,287.56.

4. Pursuant to Stipulation of Counsel dated July 5, 1962, and filed herein and Order of Court lodged herein on July 27, 1962, and pursuant to Pre-Trial Hearings concluded on the 16th day of October 1962, IT IS ORDERED:

1. That the premises formerly owned by Bayview Village, Inc. No. 1 and the premises formerly owned by Bayview Village, Inc. No. 2 may be shown and designated herein as "Bayview Village"; that the properties owned by said respective Corporations, condemned herein, may be considered and valued as a unit; and that a single award may be made by the jury in relation thereto, without the necessity of any apportionment between the properties owned by said Corporations.

2. That any Federal Housing Administration letters, introduced in evidence, are received solely as evidence of Federal Housing Administration policy exist-

## COURT'S COMMENTS TO THE JURY

Appellants' first Specification of Error attacks a comment made by the trial court in the course of its instructions to the jury. The particular comment, a portion of eleven transcript pages of comments, was:

> "Wherry legislation had for its purpose the providing of low-cost housing for military and Naval personnel and for civilian personnel employed by the armed forces. The purpose of the legislation was to make the building and operation of Wherry housing attractive to sponsors, builders and operators. It was not the purpose of the legislation to drop any vast amount of money into the pockets of the sponsors. You will have to decide whether, as contended by the defendant owners, upon the completion of the project and four or five years' operation it was then worth in excess of two million dollars as fair market value, or whether, as contended by the plaintiffs, it had a value of two hundred fifty thousand dollars to two hundred eighty thousand dollars plus the reserve fund which defendants had retained, or whether it had some other amount as fair market value.

> "This is the end of my comments. You may disregard them entirely. I am certainly not telling you what kind of verdict to bring in, in this case. I am trying to give you some help in how to approach this problem. You may disregard these comments entirely, because they are not instructions of law."

In addition to the concluding remarks quoted, the Court had also prefaced its comments on the evidence with a like warning that the jurors were the sole judges of the facts and might entirely disregard the comments. Before the jury retired for deliberation, Appellants excepted to the comment, and after the jury retired, by motion, sought to have the Court recall the jury for reception of additional evidence and clarification of the instructions relevant to the comment.

In the context of this trial, we do not consider the comment to be wrong, unfair or prejudicial. Both parties had elicited considerable testimony regarding the purpose of the Wherry legislation. Such purpose, and the Federal Housing Administration policies implementing the purpose, were treated as questions of fact to be considered by the jury for their impact upon issues of the probability of approved rental increase schedules and mandatory garage occupancy with each unit—issues which had been injected into the case by Appellants. Appellants rely upon a criminal case, Quercia v. United States, 1933, 289 U.S. 466, 53 S. Ct. 698, 77 L.Ed. 1321, for their conclusion that the verdict should be reversed because of the trial judge's allusion to "any vast amount of money" in his factual comment. In Quercia, the trial judge, referring to the defendants' testimony, had said: "I think that every single word that man said, except when he agreed with the Government's testimony, was a lie." Before the Supreme Court, the defendant was assisted by the Solicitor General's confession of error, and the Court held the flat statement to be not an analyzation of the evidence and not a fair comment, but a hostile, argumentative denunciation of the defendant's testimony. We agree with Appellee that this civil case falls within the rule enunciated in Doyle v. Union Pacific

---

ing at the date thereof and they are subject to change by any then existing, or future, Administrator of Federal Housing Adminstration; and they do not have the effect of law or a Federal Regulation.

3. It is the desire of the Court to limit and restrict the use of the word "wind-

fall" in defining excess mortgage proceeds, and counsel for both parties are admonished to as nearly as possible refer to the excess of mortgage proceeds over actual cost of construction as "excess mortgage proceeds", and to so instruct their witnesses.

Railroad Co., 1893, 147 U.S. 413, 13 S.Ct. 333, 37 L.Ed. 223:

> "It is true that the remarks made by the judge must have indicated to the jury that his own view was against the plaintiff's right to recover. But it has often been held by this court that it is not a reversible error in the judge to express his own opinion of the facts, if the rules of law are correctly laid down, and if the jury are given to understand that they are not bound by such opinion. Baltimore & P. R. R. Co. v. Fifth Baptist Church, 137 U.S. 568, 11 Sup.Ct.Rep. 185, [34 L.Ed. 784;] [34:784]; Simmons v. United States, 142 U.S. 148, 12 Sup.Ct.Rep. 171, [35 L.Ed. 968]."

Viewing the comment as a whole, we think the trial court here specifically left it to the jury's judgment to return any verdict within the entire scope of the opinion testimony of the valuation experts.

■ To buttress their assertion of error, Appellants quote copiously from the record to show that outside the presence of the jury, the trial court had plainly announced its opinion that Appellants' claims for just compensation were exorbitant. A trial court's comments outside the jury's hearing are irrelevant.

### INADEQUACY OF VERDICT

■ The jury returned a verdict of $692,300 as just compensation for the leasehold interests condemned, subject to outstanding mortgages of $6,549,937. The most liberal government appraiser's opinion of value was $281,511 as contrasted with the top opinion of Appellants' appraisers, $2,111,063. Appellants assign as error that the award was grossly inadequate. Unless we conclude that the jury's verdict was based on opinion testimony of an expert witness whose stated reasons for his opinion were "patently unsound and without support in the record" [United States v. Certain Intrests in Property (4 CCA 1951), 296 F. 2d 264; Likens-Foster Monterey Cor-

poration v. United States (9 CCA 1962), 308 F.2d 595], this case is governed by the principle adopted by this Court in Simmonds v. United States (9 CCA 1952), 199 F.2d 305, and United States v. Johnson (9 CCA 1960), 285 F.2d 35. "The jury's award of $1,820,000 is supported by competent evidence and is within the range of expert testimony, and, therefore, will not be disturbed on appeal." As will be shown in our further discussion, we believe that the reasons advanced by the experts were not patently unsound and were supported by a record free from reversible error. The jury award within the scope of the expert opinions is not inadequate.

### EVIDENCE OF OTHER WHERRY SALES

Following paragraph 6 of the Pre-Trial Order (supra, Footnote 1), the trial court permitted the government experts to testify to information they had obtained regarding the price received for the sale of all the capital stock of two other Wherry Housing Act lessee corporations and of the income experience of these corporations before the sales, and also with respect to two projects constructed under Section 608 of the federal housing legislation. The projects so relied upon were Buena Vista Gardens, San Diego, California; Park La Jolla, San Diego, California; Barksdale Airforce Base, Shreveport, Louisiana; and Quantico Marine Base, Quantico, Virginia. The government experts relied upon this information as a guide to a proper multiplier to be used in capitalizing net income after debt service to arrive at an opinion of the fair market value of Appellants' interest in the Bayview Project as of the date of taking. Appellants objected to, and assign as error, the reception of this testimony, affirming that it represents a patently unsound basis for expert opinion.

■ In Fairfield Gardens, supra, this Court carefully reserved its opinion as to whether the admission of such testimony would be an abuse of the trial court's discretion. Now that the problem is pre-

sented, we find the reasoning of the Court in United States v. Certain Interests in Property (2 CCA 1964), 326 F.2d 109, most persuasive. The factors relied upon there to sustain the use of such information as a basis for expert opinion are equally applicable here and are sustained by the evidence. The evidence is uncontradicted that the market for an investment of the kind here involved is nationwide in scope. The factors affecting the risk of an assured annual minimum net income for forty-six years or more were, in the opinion of the government experts, the prime determinant of market value. Their reasons for using this approach to value were not patently ridiculous and unsound and the Court did not abuse its discretion in permitting the testimony and in limiting its application under a carefully phrased instruction, which clearly informed the jurors that the other sales were not comparable in the traditional sense and were not substantive evidence of value but could be weighed and considered with the other bases and reasons for the expert valuations in their consideration of the expert opinion evidence. The Court did not abuse its discretion in permitting such evidence. United States v. Johnson (9 CCA 1960), 285 F.2d 35. To hold otherwise would be, in substance, to disagree with the decision of this Court in Likens-Foster Monterey Corp. v. United States, supra. In that case, the government expert testified that he based his capitalization rate, in part, on the average ratio of price to net income resulting from the sales of fourteen FHA-financed projects. The Court held this to be a permissible basis for expert opinion although the parties had stipulated that there would be no evidence of comparable sales. Here the Court went one step further and permitted the witness to testify to each sale, the purchase price and the average net income and to compute the ratio of price to average net income. Any distinction between this and the Likens-Foster case is without a difference of substance.

## EXCLUSION OF MEMORANDUM OF ACTING ASSISTANT SECRETARY OF DEFENSE

Appellants' Exhibit AE for identification, which was rejected by the Court, was a memorandum of Robert A. McDonald, acting Assistant Secretary of Defense, dated November 7, 1957, entitled "Acquisition of Wherry Housing". It purported to provide guidance and to establish uniform appraisal criteria governing negotiations for and the acquisition of Wherry Housing projects. It was allegedly relevant because it did not include the capitalization of net income after debt service as a suggested valuation technique, this being the method followed by the Government expert witnesses at the trial, and also because it required consideration of the economic life of the property.

The memorandum was first offered on cross-examination of government witness Schlicta, who said he could not recall the particular letter and didn't accept or rely upon any binding instructions from the Department of Defense. Subsequently, an offer of proof was made without further foundation. No appraisal witness testified that he had studied and relied upon the document in reaching his opinion of value, and no foundation was laid for the exhibit. Assuming its genuineness as a government document and that it proved its own authenticity, it was incompetent as evidence for the purpose offered, that is, to limit, restrict or define appraisal techniques permissible in valuation of the condemned leaseholds. This was a judicial function which could not be regulated by memoranda issued by the executive department, and the reception of such an exhibit would not be unlike admitting an appraisal textbook into evidence for consideration of the jury.

## EXCLUSION OF LETTER OF FHA GENERAL COUNSEL

At the preliminary court trial of the "windfall" issue, Appellants offered a letter written by the General Counsel

of the Federal Housing Administration dated July 7, 1960. The letter is found at 205 F.Supp. [745] 760, and was offered by reference to its text as there printed. The letter was not relevant to the issues stipulated for separate trial. It was not re-offered at the jury trial as a statement of FHA policy relevant to the impact of a windfall upon an application for increased rents.

## EXCESS MORTGAGE PROCEEDS

The problem of excess mortgage proceeds, sometimes called "windfall", that is, that the money received by the sponsors through the FHA insured loans exceeded the actual construction cost of the Bayview Housing Project, was injected into the case by Appellant's insistence on placing in issue the probability that lessee's gross income after June 1, 1959 would have been improved by reason of approved rent increases. The evidence showed that a preliminary application had been approved by the District Office in San Diego for a rent increase of $4.05 per housing unit in the project. Final approval rested with the Washington office. Under the leases and FHA regulations, the rents charged tenants could not be increased without FHA consent, and the application for an increase would be referred also to the Navy Department for its recommendation.

The government appraisal witnesses relied upon the actual earnings of the project prior to June 1, 1959 in forecasting future earnings for capitalization of net income. The Appellants' expert witnesses relied upon forecasts of future income calculated on the assumption that final approval would be given the proposed per unit increased rental charge, and that the FHA would approve a new rental schedule requiring each tenant to rent a garage with his housing unit. Before the date of taking, rental of a garage was voluntary and a substantial number of the garages were vacant. Much of the trial was concerned with evidence pertinent to FHA policy with respect to such anticipated increases in income, and the question presented to the jury was how the possibility of such increases would influence market value in negotiations between a willing buyer and willing seller.

■ When Appellants' claim of increased income was asserted in pre-trial proceedings, the government countered that there had been a "windfall" which, under FHA policy, would have an effect on the processing of an application for increased rentals. Appellants thereupon requested a court trial of the windfall issue. The trial was held and the court concluded that there were excess mortgage proceeds in the amount of $355,287.56 (Footnote 3). Appellants complain of the Court's failure to allow the builder's fee as an expense in computing excess mortgage proceeds, but the Court's finding in this respect is supported by substantial evidence relative to applicable FHA policy and will not be disturbed on appeal.

■■ Appellants also sought to have the Court go beyond the factual finding of excess mortgage proceeds and to determine FHA policy dealing with the effect of the existence of a windfall upon an application for increased rents. We find no error in the Court's ruling sustaining the Government's objection to such an expansion of the stipulated court trial (Footnote 4). A trial court's interpretation of its own pre-trial proceedings, in these circumstances, is well-nigh conclusive. Likens-Foster Monterey Corporation v. United States (9 CCA 1962), 308 F.2d 595.

■ The question of the effect of the windfall on an application for increased rents under FHA policy was left to the jury under appropriate instructions. Appellants' final contention of error is that this was in reality a question of law, that there was no conflict in the evidence, that, under any view of FHA policy, the fact of a windfall could have no impact on whether or not rent increases would be approved and that the Court, therefore, committed grievous error in permitting the jury to have any knowledge that Appellants had built the

project for less than they had received as proceeds of the FHA insured mortgages.

It should be observed that the Acts of June 30, 1953 (Public Law 94, 83rd Congress, 67 Stat. 121), and of August 2, 1954 (Public Law 560, 83rd Congress, 68 Stat. 590), in which Congress sought to alleviate the possibility of a windfall, were not applicable to the Bayview Project. Here both parties agreed that if FHA had found that excess mortgage proceeds resulted from the construction of the Bayview Project, the FHA, in processing an application for increased rents, would have deducted the excess mortgage proceeds from FHA estimated construction cost at the time the project was bid. Appellants say that this is all that could have happened and that inasmuch as FHA regulations permitted a rental schedule which would produce not more than $6\frac{1}{2}\%$ of the estimated replacement cost annually and the bid of the sponsors of the Bayview Project provided for only $5\frac{1}{2}\%$ (approximately) return, the existence of excess mortgage proceeds in the amount of $355,287.56 could not affect the rent increase sought by the Appellants.

The Government contended, on the other hand, that if the application for a rent increase had been fully processed by the FHA, the determination that there had been excess mortgage proceeds would have changed the so-called "dollar amount" of revenue permitted to the lessee. In support of this contention, Robert A. Renfro, for many years a top official in the Federal Housing Administration in Washington, D. C., testified in substance that in the initial authorization for the housing project, the military agency and the Federal Housing Administration set up a rental schedule for the contemplated housing units, that the expenses of operation were estimated, resulting in an estimated "dollar amount" of net return, which was acceptable if it did not exceed $6\frac{1}{2}\%$ of the estimated replacement cost. He stated that the general Federal Housing Administration policy was to hold the net return of the

lessees to the same dollar amount so computed in processing an application for rent increases. He further testified that if there had been excess mortgage proceeds, the amount thereof would be deducted from the original estimated replacement cost, and the original rate of return would be applied to the adjusted estimated replacement cost which would result in a lower "dollar amount" of net return permissible as a ceiling in processing an application for rent increases.

This formula was applied to the Bayview Project. The original estimated replacement cost was $8,312,954. The original "dollar amount" was $466,088, providing a rate of return of 5.6%. The adjusted estimated replacement cost, after deducting the windfall of $355,287, was $7,957,666, and applying the original rate of return thereto, the revised dollar amount of permissible net return was $455,629. This evidence of FHA policy was submitted to the jury for its consideration in determining how that policy, as related to Appellants' contentions of probable final approval of increased rent schedules, would have affected negotiations between a willing buyer and a willing seller in arriving at a fair price for the property interests taken by eminent domain.

True, the FHA policy letters received in evidence might be interpreted differently, and other witnesses testified that the windfall policy would not affect the "dollar amount". This, nevertheless, was a conflict which the Court properly submitted to the jury in the manner indicated, and affords no basis for reversible error to Appellants.

██ It also should be noted that early in the trial, Appellants insisted, over objection, upon submitting in evidence the sponsor's original bid for the construction of the Bayview Project and many related documents, and elicited testimony from their appraisal experts regarding why a Wherry Project was an attractive investment to sponsors and builders. This opened the door to cross-

examination to show the difference between the attractiveness of the investment to the original sponsors as compared with the position of an investor buying the leasehold of a completed project. Such differences included not only the possibility of excess mortgage proceeds (evidence of which Appellants have complained), but also the possibility of completing construction ahead of schedule so that rental income could be received in substantial amounts before any principal payments were due under the mortgages, and the possibility of a "tax shelter" in the early years of operation. This, again, demonstrates the relevancy of the windfall evidence and the absence of reversible error in its reception.

## EVIDENCE OF REPLACEMENT COST

■ In its pre-trial order, the Court ruled that evidence of reproduction cost would be excluded. This portion of the proposed pre-trial order was not objected to by Appellants in their pre-trial memoranda. At the trial, John L. Vaughn, Jr., a valuation expert for Appellants, was permitted to testify that he had computed reproduction cost and had, in effect, used it as a check against his other calculations of value, but was not permitted to give the actual figures, all this without serious objection from Appellants' counsel and without a specific effort to get the reproduction cost figures in evidence. We think the error assigned was not properly preserved.

■ In any event, the law does not require the reception of such evidence. True, this Court held, in United States v. Johnson (9 CCA 1960), 285 F. 2d 35, that it was not error to permit evidence of reproduction cost coupled with evidence that a prudent investor would reproduce the project at such a cost, as a guide to expert opinion. It does not follow that the rejection of bare reproduction cost evidence is error. It is "Hornbook" condemnation law that just compensation is measured by the value of what the Government takes, not what the owner loses. Mitchell v. United States, 1925, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644; United States v. General Motors Corp., 1945, 323 U.S. 373, 65 S. Ct. 357, 89 L.Ed. 311. In our opinion, the guides to valuation permitted by the trial court in this case are more consistent with this principle, and that evidence of reproduction cost less depreciation tends, rather, toward a valuation of what the owner has lost, i. e., the intrinsic value of the condemned leasehold. This is not to say that in a different case, the trial court might not properly exercise its discretionary control over expert testimony to permit reproduction cost evidence as a best available guide to expert opinion.

Our Circuit, like the Fourth Circuit in United States v. Certain Interests in Property (4 CCA 1961), 296 F.2d 264, has favored a "broad rule of consideration of evidence in condemnation cases, the only condition being that there be a showing that willing vendees and vendors would deem such evidence or information relevant in their negotiations", and has relied upon the discretion of the trial court to keep the scope of the trial within reasonable bounds. We discern no abuse of discretion here.

## OTHER DISCRETIONARY RULINGS

■ Appellants' assignments that the trial court committed prejudicial error in handling a government expert witness, Joseph Schlicta, in denying a motion that the case be tried before a commission and in denying production of an FBI accountant's report and certain FHA files, all relate to rulings within the discretion of the trial court. The court did not abuse its discretion and Appellants were not prejudiced by such rulings. In its comments to the jury, clearly characterized as such, the court summarized a portion of Schlicta's testimony. The summary was substantially correct and

the jurors were repeatedly admonished that they were not bound by the comments and should rely on their own recollections.

The Judgment is affirmed.