**BIGGS RENTAL COMPANY**
v.
**The UNITED STATES.**
No. 420–61.

United States Court of Claims.
Dec. 17, 1965.

Bert W. Levit, San Francisco, Cal., attorney of record, for plaintiff. Long & Levit, San Francisco, Cal., of counsel.

Rodney H. Hamblin, San Francisco, Cal., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant. Kenneth H. Masters, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

LARAMORE, Judge.

This is an action for the alleged taking by the government of certain personal property owned by plaintiff. In the alternative, plaintiff claims restitution plus rent. Plaintiff alleges defendant took its personal property at Fort Ord, California, simultaneously with the condemnation of the property interests of two "Wherry" housing corporations,[1] namely, the Likins-Foster Ord and Likins-Foster Monterey Corporations.

In 1950, two Wherry housing projects of 500 units each were built for Fort Ord personnel at Monterey, California. The first project, known as Bay View Park, was owned by Likins-Foster Ord Corporation (hereinafter L–F Ord). The second project, known as North Bay View Park, was owned by Likins-Foster Monterey Corporation (hereinafter L–F Monterey). Both corporations were wholly-owned by the partnership, Likins-Foster & Associates, and later, by its successor, Likins-Foster Honolulu Corporation. T. Jack Foster was president of the above corporations.

Prior to the commencement of the L–F Ord and L–F Monterey projects, two other Foster-controlled corporations had started construction on Wherry housing at the Biggs Air Force Base in El Paso, Texas. As a result of discussions between Foster's partner and the Commanding General at Biggs regarding methods of increasing the occupancy rate of the housing units, a corporation was set up to purchase furniture for rental to service personnel whose own furniture had been delayed in shipment. It was necessary to use a separate leasing corporation because charter limitations of the Wherry Act forbid Wherry corporations from renting household furniture and television antennas.

The occupancy problem was the same at Fort Ord. Military personnel reporting for duty from foreign assignment frequently did not have the necessary furnishings for an unfurnished apartment. This caused great inconvenience because even though apartments were available, they were not usable for lack of furniture. After discussions concerning this problem between Foster, the Commanding General, and others at Fort Ord who had heard of the furniture rental operation at Biggs, a third corporation, the plaintiff, was incorporated. Plaintiff thereafter purchased apartment furnishings to rent to military personnel. The two Wherry corporations and plain-

---

1. Under the Wherry Act (Housing Near Military Establishments), 63 Stat. 570 (1949), 12 U.S.C. §§ 1702, 1706, 1715c, 1716, 1748–1748g (1964), sponsor corporations, known as "Wherry" corporations, lease property from the government on which they build housing to be rented to military personnel. The lessees receive quarters allowances from the armed services and pay rentals directly to the corporations. Rental payments for furniture and television antennas, involved here, would not be covered by quarters allowances.

The Act, which provides certain financial and insurance benefits, requires that there be a separate corporation for each project.

tiff utilized the same office and the same employees and plaintiff stored its personal property in the warehouses owned by the Wherry corporations. The military tenants, if they chose to rent either household furniture or a television antenna, or both, entered into a rental agreement with plaintiff, separate from the rental of apartments from either of the Wherry corporations.

In January of 1957, it was determined that "Capehart" housing [2] would be constructed at Fort Ord, thus making it necessary for the government to buy or condemn the equities of L–F Ord and L–F Monterey. The United States Army Chief of Engineers as designee of the Secretary of Defense had the responsibility for acquiring the Wherry housing at Fort Ord. Under the special regulations issued by the Office of the Chief of Engineers, the Real Estate Division of the San Francisco District, Corps of Engineers, was given the responsibility of carrying out the acquisition. On January 18, 1957, the San Francisco District Engineer's Office, by identical letters, advised L–F Ord and L–F Monterey that acquisition of their housing projects, situated within the Fort Ord Military Reservation, was mandatory. Inquiry was made in the letters as to whether L–F Ord and L–F Monterey would agree to negotiate. The two corporations, through their vice-president and attorney, Ro C. Lytle, agreed to negotiate.

On August 29, 1957, the San Francisco District Engineer's Office received a teletype from the Office of the Chief of Engineers, authorizing negotiations to acquire the two Wherry housing projects at Fort Ord. The teletype was received in advance of the Real Estate Directive (approved August 26, 1957), which was not received in the San Francisco District Engineer's Office until October 29, 1957. The Real Estate Directive, designated RE–D 6950, set forth the interest

to be acquired from L–F Ord and L–F Monterey as—

Termination of sponsors' leasehold interest by purchase of sponsors' equities subject to outstanding mortgages.

Negotiations were commenced by telephone and by letter between Lytle for the two Wherry corporations and defendant's agents. Throughout negotiations for the acquisition of the housing interests of L–F Ord and L–F Monterey, there was no reference to, nor any negotiation with, the plaintiff. Plaintiff was neither a Wherry nor a sponsor corporation. The Chief of the Real Estate Division, San Francisco District Engineer's Office, was not informed by the plaintiff of its existence or that it had property at Fort Ord until the court hearing on November 7, 1957. However, the Army authorities at Fort Ord were, at all times, familiar with the existence of the plaintiff and its property.

When negotiations for acquisition of the equities of L–F Ord and L–F Monterey failed, the Army was required by law to condemn the interests of the two Wherry corporations. The Chief of Real Estate in the San Francisco District Office, Army Engineers, had prepared the requisite pleadings. One complaint in condemnation and two declarations of taking were filed, all on November 1, 1957, with Declaration of Taking No. 1 describing the estates and interests of L–F Monterey Corporation, and Declaration of Taking No. 2 describing the estates and interests of L–F Ord Corporation. Included within the taking were 1,000 housing apartments, two warehouses, and items which were covered by chattel mortgages, namely, stoves, water heaters, refrigerators, and window shades, most of which were installed in the houses, but some were stored in the warehouses. The two Wherry corporations also owned numerous items of personal property not

---

2. Under the Capehart Housing Act, the government owns and operates housing at or near military bases. Tenants do not pay for Capehart housing and, therefore, do not receive quarters allowances. The procedure for transforming Wherry housing into Capehart housing is provided for by 69 Stat. 635, 652 (1955), as amended, 70 Stat. 1091, 1111 (1956), 12 U.S.C. § 1748 (1964).

covered by the chattel mortgages, but used in connection with the operation and maintenance of the 1,000 housing units. On November 1, 1957, the Order for Delivery of Possession was issued and served on the two Wherry corporations. A dispute immediately arose as to whether the personal property owned by the two Wherry corporations, consisting of maintenance equipment, spare parts, and office furniture, but which was not covered by the chattel mortgages, was included within the term "apparatus and equipment" as used in the condemnation pleadings.

On November 1, 1957, plaintiff owned the following property at Fort Ord: an unworkable master television antenna system worth $37,820; 775 individual TV antennas installed in the housing units and rented on a monthly basis, worth $19,375; extra antennas and parts stored in the two Wherry warehouses, worth $537.66; and household furniture of all kinds, most of which was being rented to Wherry housing tenants, but some of which was stored, worth $11,576.

It is clear that there was confusion at the time as to the disposition of plaintiff's property. However, a review of the facts shows that by December the plaintiff knew or should have known that the defendant had no intention of including plaintiff's property in the condemnation proceedings. No documents or letters stating that the government was taking or wanted to purchase any of the plaintiff's property were served or mailed to the plaintiff and no notice was served on the tenants concerning property leased from the plaintiff. Plaintiff was not directed to stop its rental business and no government officer or representative, orally or in writing, told any of plaintiff's officials that it could not remove its personal property. The Army authorities did not use the master TV antenna system; it was inoperative at all times pertinent to this action. It was physically located on telephone and electric light poles, for which the plaintiff paid pole rent. Plaintiff was not named in the condemnation action, and none of its property was in any way described or referred to in the action. As a matter of fact, in a letter of December 23, 1957, the United States Army Engineer District, by registered mail, wrote to Likins-Fosters & Associates in part, as follows:

* * * It is the government's position that nothing was taken from the Biggs Rental Company.

On November 8, 1957, a meeting was held in the office of an Assistant United States Attorney, which was attended by Foster, Lytle, and representatives from the Justice Department, the Corps of Engineers and Fort Ord. Since the District Court had not ruled on whether the personal property had been condemned, this meeting was called to discuss the personal property of the two Wherry corporations and of the plaintiff. Foster and Lytle reiterated their stand that the condemnation proceedings included the personal property of all three corporations, and that they would leave it all at Fort Ord. The government representatives reiterated their opinion that the condemnation pleadings included only the items on the chattel mortgages and did not include any other personal property. Foster offered to disassemble the master television antenna system but was told that it might be used by the Army for educational television.

It was agreed at this meeting that two inventories would be prepared, one of all of the disputed maintenance personal property of L–F Ord and L–F Monterey, and the second of all of the rental personal property owned by the plaintiff. It was agreed that the values of the items would be arrived at using standard valuation methods and accepted depreciation schedules. The purpose of the inventories was that if the parties agreed as to the number and identification of the items and their value, it would eliminate such issues from the condemnation trial. Thus, the only issue for the District Court that would be left would be the legal one, i. e., was the personal property taken within the condemnation pleadings.

When the inventories were completed, on November 21, 1957, all parties were

furnished duplicate copies of the joint inventories. Shortly thereafter, the three corporations ceased business at Fort Ord and left all of their personal property, as shown on the inventories, at Fort Ord, but advised defendant that they expected to be paid therefor. (Subsequent minor mathematical changes were made in the two inventories, which are immaterial to this case.) The Army then placed the personal property of the two Wherry corporations and of plaintiff in warehouses (with the exception of the inoperative master television antenna, which remained on public utility poles).

The property remained in the warehouses at the trial of the condemnation case on January 13, 1960. The United States District Court entered its order that the maintenance equipment, spare parts, office furniture, and service vehicles owned by the two Wherry corporations were condemned. The sum of $49,-534.58, being the amount of the inventory previously agreed upon, was paid to the two Wherry corporations. Plaintiff appeared at the trial and the District Court found that the condemnation pleadings did not describe any property or property rights of the plaintiff. Likins-Foster Monterey Corporation v. United States, 308 F.2d 595 (9th Cir. 1962).

■ Under the above facts, we are called upon to determine whether in fact there was a taking of plaintiff's property by the government for which payment is owing. In this connection, it is well settled that to constitute a taking there must be an intent on the part of the United States to take plaintiff's property. As this court stated in B. Amusement Co. v. United States, 180 F.Supp. 386, 389, 148 Ct.Cl. 337, 341 (1960):

> To constitute a taking there must be an intent on the part of the United States to take plaintiffs' properties, or, at least, an intention to do an act the natural consequences of which was to take the property.

This is the issue in this case and the conclusion is inescapable that the defendant did not intend to nor did it take the property in question.

■ The facts show that the defendant did not use plaintiff's property or prevent plaintiff from continuing its rental business; nor did defendant prevent plaintiff from removing its personal property. There was no directive or order issued by the Army to acquire any of plaintiff's property and no negotiations to purchase any of it.

The evidence shows that continuation of plaintiff's rental business probably would have been unprofitable because plaintiff no longer could utilize the office space, warehouse space, or employees of the Wherry corporations as it had done before the condemnation. Under those circumstances, the evidence clearly shows that plaintiff's representatives left all of its personal property at Fort Ord and it is there today.

Plaintiff says a government agent informed it that the Army wanted the master antenna system for use in an educational program and that this evidenced a contract to purchase the same. Even if plaintiff was told this, the letter of December 23, 1957, previously quoted in part, made it clear that the government never intended to either take or purchase any of plaintiff's property. Assuming the government employee stated the Army wanted the system, there is no evidence to indicate that he had power to enter into a contract to purchase the system. Thus we think the conduct of plaintiff through its officers indicated an intention to abandon the property.[3] At least, when informed it could have the property, the plaintiff made no effort to remove the same. In those circumstances the government was more or less in the role of an involuntary bailee. As such, the government had the duty only to reasonably protect the property while in storage. This it did. The government placed roving guards around the premis-

---

3. We do not use the word "abandon" in the usual technical sense, i.e., that plaintiff left the property on the premises without ever intending to either be paid for same or to ever take steps for the return thereof.

**1018**

es and did everything necessary to protect plaintiff's property.

Respecting plaintiff's claim for the rental value of its property, the facts show that the plaintiff has failed to prove any fair market value for the rental of any or all of its property, nor has plaintiff shown that it is entitled to any rent for the property.

In summary, we hold that the evidence fails to establish a taking of plaintiff's property for which recovery can be had, and plaintiff's petition, therefore, must be dismissed.